## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EXPRESS MOBILE, INC.

       Plaintiff,

   v.

DREAMHOST, LLC

       Defendant.

C.A. No. 18-1173-RGA

**JURY TRIAL DEMANDED**

### PLAINTIFF EXPRESS MOBILE, INC.'S RESPONSE IN OPPOSITION TO DEFENDANT DREAMHOST, LLC'S MOTION TO DISMISS

Timothy Devlin (#4241)
Devlin Law Firm LLC
1306 N. Broom St., 1st Floor
Wilmington, DE  19806
Telephone:  (302) 449-9010
tdevlin@devlinlawfirm.com
*Attorneys for Plaintiff Express Mobile, Inc.*

DATED:   January 25, 2019

# TABLE OF CONTENTS

I.    Nature and Stage of Proceedings ................................................................................. 1

II.   Summary of Argument ................................................................................................. 1

III.  Background ................................................................................................................... 2

    A.  Prior Art Methods of Building, Storing and Rendering Web Pages Were Cumbersome and Inefficient ................................................................................................................... 2

    B.  The Express Mobile Patents Teach a Radical New Methodology for Creating, Storing and Building Web Pages on the Fly ................................................................................... 3

    C.  The Express Mobile Patents Offer Substantial Improvements in Computer Performance and Web Design ........................................................................................................... 5

IV.   Argument ...................................................................................................................... 6

    A.  Legal Standard ........................................................................................................ 6

    B.  The Abstract Idea Exception Is Not Supported by the Text of Section 101 ..................... 7
    C.  Defendant's Purported "Abstract Idea" Fails to Account for the Actual Express Mobile Inventions ............................................................................................................... 7

        1.  The Cases on which Defendant Relies Are Distinguishable ............................... 11

    D.  The Express Mobile Patent Claims Amount to Significantly More than the Proposed "Abstract Idea" ...................................................................................................... 13

        1.  The Claims Include Additional Unconventional Features Never Addressed by Defendant's Motion ............................................................................................ 13
        2.  The Claims Each Recite Individual Elements and an Ordered Combination that Go Beyond Defendant's Proposed Abstract Idea ...................................................... 15

    E.  At a Minimum, Factual Issues Preclude Summary Disposition ........................................ 17

    F.  Willful Infringement ............................................................................................... 19

    G.  Compliance With the Marking Statute Is a Question of Fact Not Suitable for Adjudication on a Motion to Dismiss .......................................................................... 19

V.    Conclusion ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Case**                                                                                       **Page(s)**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018)....................................................................17

*Affinity Labs of Texas, LLC v. Amazon.com, Inc.*,
838 F.3d 1266 (Fed. Cir. 2016)....................................................................11

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)....................................................................11

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
134 S. Ct. 2347 (2014)..........................................................................*passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F. 3d 1288 (Fed. Cir. 2016)...........................................................9,10,16

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
876 f.3d 1350 (Fed. Cir. 2017) ....................................................................19

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016).................................................................10,17

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....................................................................18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed Cir.)..............................................................................17

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)..............................................................*passim*

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)...........................................................................7

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
No. 17-1272 2019 U.S. LEXIS 566 (Jan. 8, 2019)..........................................7

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)................................................................12,13

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018)....................................................................11

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016)..................................................................8,16

*Rapid Litig. Mgt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016)..................................................................8,11

*SAP Am., Inc., v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)....................................................................11

*Skinner v. Switzer*,
562 U.S. 521 (2011).......................................................................................7

## I.      NATURE AND STAGE OF PROCEEDINGS

On August 4, 2018, Express Mobile, Inc. ("Express Mobile" or "Plaintiff") filed a complaint for patent infringement against DreamHost, LLC ("DreamHost" or "Defendant") alleging infringement of U.S. Patent Nos. 6,546,397, 7,594,168, (D.I. 1), and later amended its complaint to include allegations of infringement of U.S. Patent Nos. 9,471,287 and 9,928,044. (D.I. 10) (the "Amended Complaint").  DreamHost filed a Motion to Dismiss.  (D.I. 13.) Express Mobile hereby provides its opposition to DreamHost's Motion.

## II.     SUMMARY OF ARGUMENT

Defendant's Motion should be denied because: (1) the Supreme Court recently held that courts are not at liberty to rewrite statutes to find exceptions, such as the implicit exceptions found in Section 101, that are inconsistent with the text of the statutes to which they are applied; (2) the claims of the Express Mobile patents are not directed to an abstract idea, but rather represent specific technological improvements in the computer field; (3) the claims amount to significantly more than Defendant's proposed "abstract idea"; and (4) Defendant has not met its initial burden to put Plaintiff on sufficient notice regarding marking.  Express Mobile is amenable to amending its pleadings regarding willfulness to specify only activity after notice.

As set forth below, the claims of the '397 and '168 patents amount to significantly more than the "abstract idea" proposed by Defendant.  That purported abstract idea ignores literally dozens of features of the Express Mobile patent claims that narrowly define the unconventional and groundbreaking improvements in the process for creating, storing and building web pages. Evidence establishes that the claims recite systems and methods of building and displaying web pages in a completely unconventional manner that improves the operation of the computer. These assertions are supported by the patent claims, specification, and prosecution history, as well as the expert testimony of Dr. Edwin Hernandez.

## III.     BACKGROUND

### A.     Prior Art Methods of Building, Storing and Rendering Web Pages Were Cumbersome and Inefficient

Prior to the invention of the Express Mobile patents, web pages were created, stored and rendered in a fundamentally different manner.  (Hernandez Decl. at ¶ 19.)  Specifically, web pages were typically created by either programming directly in HTML or JavaScript code, or by using a visual editor that output HTML files.  The result was a collection of pages of computer code or "pseudo code"—typically HTML, JavaScript, or Java applets—which defined the visual layout, style and page logic in a manner that was compatible with the Internet standards at the time.  (*Id*.)  These code files defined all the fixed parameters of the web page.  While content (for example, photographs) could be dropped into certain placeholders, the overall format and structure of the web page was fixed, as defined by the code.  (*Id*. at ¶ 20.)

Conventional methods suffered from a number of flaws.  First, creation of the web page could be cumbersome, in particular when web pages could not be viewed during the creation process as they would later appear in various browsers or devices.  (*Id*. at ¶ 25.)  Moreover, each individual web page of a website needed to be stored in its HTML or pseudo-code form and so wasted space and required longer access times.  (*Id*. at ¶ 25.)  It also led to slow downloading of the web page file to a user's computer, and slower rendering by the browser, increasing the dreaded wait time for a page to load.  (*Id*. at ¶ 25.)

Moreover, when prior art web pages were rendered on different operating systems or browsers, web pages would often display errors or unnecessary whitespace.  (*Id*. at ¶¶ 26, 28.) For some of the most glaring errors, multiple alternative web pages for the most common combinations of operating system/browser/device, etc. could be designed. (*Id*. at ¶ 26.)  But this "solution" severely impacted productivity when creating and later editing web pages, and only

2

partially solved the problem.  The Background section of the Express Mobile patents is replete

with references outlining the shortcomings of then-current methods for web publishing:

> Conventional mark-up and scripting languages have not been designed for serious
> multimedia applications.  They have almost no file handling ability and very little
> computational power.  In addition, they are remarkably slow and inefficient.

(Ex. 1 at 1:17-21.) (The two Express Mobile patents share the same substantive specification,

and so for convenience only the '397 patent is cited.)  The result is inflexible rendering of the

web page on a screen, resulting in formatting errors and wasted screen space.  (*Id*. at 1:40-49.)

Other companies were also exploring ways to improve upon conventional web publishing

models, but none of them matched the radical inventions of the patents in suit.  U.S. Patent No.

5,842,020 to Faustini was a primary reference asserted against the Express Mobile claims during

prosecution.  (*See, e.g*., Ex. 3 at 4-8.)  However, while Faustini made use of run time files and

Java virtual machines, it lacked the radically inventive features of the Express Mobile patents,

such as defining the web page as a collection of user settings, storing information related to those

settings in a database, and then later using that information to render a web page via a run time

file and virtual machine.  (Hernandez Decl. at ¶ 23.)

### B.    The Express Mobile Patents Teach a Radical New Methodology for Creating, Storing and Building Web Pages on the Fly

Unlike prior art methods, the Express Mobile patents bring together disparate ideas and

concepts for creating, storing and building web pages.  These features and concepts are set forth

in roughly 64 columns of Specification text, along with more than sixty Figures.  (*See* Ex 1.)

This massive specification is necessary to lay out in detail all the features and concepts in this

unconventional way of making and using web pages.

As set forth in the Summary of the patents, this inventive methodology generally involves

building a web page by defining it as a set of user-selected "objects" and/or "settings."  This can

3

include building the page using a "What You See Is What You Get" or "WYSIWYG" environment, so that the page can be viewed, as it is created or edited, in the same manner it will appear on different types of screens when later accessed. (*See, e.g.,* Ex. 1 at 2:32-37.) Unlike conventional models, the result is not a collection of computer code, but instead a group of user selected objects and settings. These can be saved in a database, for ease of access and efficient storage. (Ex. 1 at 2:39-42.) Since code files do not need to be stored, the page structure—the vast majority of the HTML code itself—is created on the fly each time the page is loaded in a user browser. (Hernandez Decl. at ¶ 34.)

This unconventional step of building the webpage HTML code on the fly is performed by the run time engine of the invention, utilizing data representative of the user settings. (Ex. 1 at 2:39-42.) This allows the system to optimize the page based on the operating system, browser, screen size, etc. (*Id*. at ¶ 36.) (To be clear, the patent claims only require part of the page to be created in this manner, to deter simplistic design-arounds.)

While prior art HTML page files could receive text or images into pre-configured placeholders, this ability was greatly limited. These methods are akin to inserting printed photographs into an existing wooden picture frame. The "frame" (the HTML file) is already constructed, and accepts a picture of a specific size. (*Id*. at ¶ 41.) In contrast, the invention of the Express Mobile patents builds the *entire picture frame* from scratch every time the web page is generated, using a set of blueprints and a stack of wood (the user-selected objects and settings). This allows the "frame" to be constructed with different dimensions, aspect, etc. to tailor the page to account for screen size, operating system and browser. (*Id*. at ¶ 41.)

Each claim of the Express Mobile patents reflects this radical new methodology, drawing together these elements into an inventive whole. Claim 1 of the '397 patent, for example, recites (among other features, which are discussed below):

- displaying a panel of settings, which a user can select to create the page (Ex. 1 at 65:47-48);

- storing information representative of those settings in a database (*id*. at 65:58-59); and

- building web pages using a run time file from information stored in the database (*id*. at 65:64-66).

Likewise, claim 1 of the '168 patent recites (among other features):

- receiving user input regarding web page objects and styles (Ex. 2 at 64:50-62) with a style that includes values that define transformations and time lines of particular types of objects;

- producing a database that holds the data defining those objects and styles (*id*. at 64:63-67); and

- producing the database so that a web browser with a run time engine can generate the web site from the object and style data (*id*. at 65:1-6).

Each of these elements *individually* comprises an unconventional approach to web page creation and rendering.  Taken together, they constitute a completely new paradigm for creating, storing, and building web pages.  (Hernandez Decl. at ¶ 29.)

**C.    The Express Mobile Patents Offer Substantial Improvements in Computer Performance and Web Design**

Intrinsic and expert evidence establishes that the inventions of the Express Mobile patents improve the operation of the computer.  For example, the invention allows for a small "run time environment," which allows faster loading speeds.  (Ex. 1 at 2:60-3:3; Hernandez Decl. at ¶¶ 52-54.)  Because of the implementation of a variety of performance and file reduction techniques, the entire run time environment can range from as low as 12K, and no larger than 50K. (Ex. 1 at 2:60-63; Hernandez Decl. at ¶ 53.)  For a typical commercial web site, the size of these run time environments is frequently an order of magnitude less than using older methods.  (Hernandez Decl. at ¶ 55.)

This relatively small file allows for fast loading speeds, even using older 56k modems prevalent at the time.  (*Id*. at 2:64-3:3.)  Again, this could be an order of magnitude faster than with prior methods, so that a page that previously took ten seconds to load could load instead in one second or less.  (Hernandez Decl. at ¶ 55.)  This structure also permits more efficient storage of web page data, as well as the ability to change the web page more efficiently by editing user settings rather than multiple versions of code.  (*Id*. at ¶ 55; Ex. 3 at 5.)

The Specification further notes that the invention permits scaling of web pages and elements within the web page, to most efficiently use the screen space.  (Ex. 1 at 2:43-48.)  This same flexibility exists during the website creation process.  (*Id*. at 2:1-4.)  Thus whereas the prior art resulted in visually disjointed web pages based on the particular browser, window size, screen resolution, operating system or device; the invention here offers consistent appearance for creating, editing and viewing web pages.  (Hernandez Decl. at ¶ 58.)

## IV.  ARGUMENT

Defendant's Motion fails under either prong of the *Alice* standard.  The claims are not directed to an abstract idea, but instead bring together numerous unconventional concepts and features.  Likewise, when viewed as an ordered combination, the claims recite many features that elevate them far beyond the abstract idea proposed by Defendant, or any other abstract idea. Instead, the claims define inventions that significantly improve computer performance.  Finally, Defendant has not properly put Express Mobile on notice of marking issues because it has not identified any specific products that Defendant alleges have been sold unmarked.

### A.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  The question resolved on a motion to dismiss under Rule 12(b)(6) is "whether [the] complaint was sufficient to cross the federal

court's threshold"—the relevant question is *not* whether the plaintiff will ultimately prevail.  *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  In evaluating a Rule 12(b)(6) motion to dismiss, courts must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### B.        The Abstract Idea Exception Is Not Supported by the Text of Section 101

The Supreme Court recently held, in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No. 17-1272 2019 U.S. LEXIS 566 (Jan. 8, 2019), that courts are not permitted to create judicial exceptions inconsistent with the text of a statute.  The judicial exceptions to patentable subject matter courts have recognized—laws of nature, natural phenomena, and abstract ideas—are similarly inconsistent with the plain text of Section 101.

In *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347 (2014), the Supreme Court noted that the exceptions to patentability are *not* found within the text of Section 101.  "We have long held that this provision contains an important ***implicit exception***: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice* 134 S. Ct. at 2354.[1]  The Supreme Court's unanimous decision in *Schein* establishes that these judicial exceptions are not permitted. "[W]e are not at liberty to rewrite the statute passed by Congress and signed by the President." *Schein*, 2019 U.S. LEXIS 566 at *5.  Similarly, the Supreme Court stated that courts "may not rewrite [a] statute simply to accommodate [a] policy concern."  *Id.* at 13.  Accordingly, Defendant's Motion should be denied.

### C.        Defendant's Purported "Abstract Idea" Fails to Account for the Actual Express Mobile Inventions

---

[1] Unless otherwise indicated, emphasis in this Brief has been added.

Defendant's assertion that the claims of the Express Mobile patents are directed to the abstract idea of "creating and displaying web pages based upon information from a user" oversimplifies the claims and ignores numerous unconventional elements.  "[I]t is not enough to merely identify a patent-ineligible concept underlying the claim; *[the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'*" *Rapid Litig. Mgt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).  In other words, the relevant inquiry is not how the claims appear at the highest level of abstraction the Defendant can imagine, but whether the claims "focus on a specific means or method that improves the relevant technology . . . ." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Here, Defendant's entire argument is premised on the incorrect methodology of viewing the claims only at their highest level of abstraction, and its flawed analysis should be rejected.

The Supreme Court cautioned against this type of gross generalization, advising courts to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354 (2014).  The Federal Circuit has likewise cautioned against the type of overgeneralization that Defendant commits here.  "We have previously cautioned that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRO,* 837 F.3d at 1313.

Ignoring these precautions, Defendant presents an "abstract idea" that is divorced from the claim language and ignores numerous specific elements that make the claims patentable. Defendant's proposed abstract idea results in exactly what the Supreme Court and Federal Circuit warned against: "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).

Contrary to Defendant's arguments, evidence establishes that many of the Express Mobile claim elements were unconventional at the time of the invention and that they represented a radical new paradigm that improved the operation of computers.  (Hernandez Decl. at ¶ 29.) While prior art systems stored web pages largely as a collection of computer code, the inventions of the Express Mobile patents store web pages as a set of objects and user-selected settings, and then creates most of the computer code on the fly each time the web page is rendered. (Hernandez Decl. at ¶ 34.)  This approach improves the process of creating the web page, leads to more efficient storage, provides faster download times, and offers consistent rendering across multiple computer environments.  (*Id*. at ¶ 55.)  This is backed by expert testimony and the patents' specification and prosecution history.  (*See, e.g.,* Ex.1 at 1:10-3:6; 1:17-21; 40-49; 2:32-48; 2:60-3:3; 64:56-63; 65:47-66; Ex. 2 at 64:50-62; Ex. 3 at 4-8.)

Indeed, the '397 and '168 patents are rooted firmly in computerized technologies, and are the exact opposite of patents that led to the *Alice* decision and its progeny.  The inventions recited in the various claims improve the operation of the computer, as opposed to merely using the computer as a tool.  This is a hallmark of patentability under *Alice* and related Federal Circuit precedent.  As with the claims at issue in *Amdocs*:

> this claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases).  The solution requires arguably generic components, including network devices and "gatherers" which "gather" information.  However, ***the claim's enhancing limitation necessarily requires that these generic components operate in an unconventional manner to achieve an improvement in computer functionality.***

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F. 3d 1288, 1301 (Fed. Cir. 2016).

As detailed above, the Express Mobile patents claim groundbreaking systems and methods for creating, storing and building web pages.  These types of improvements in computer operations are consistently upheld by the Federal Circuit under Section 101.  In *Enfish*, the

9

asserted patents claimed an improvement over the relational database model that allowed storing information in a single table, by making use of a special row defining the characteristics of a column in that same table. *Enfish,* 822 F.3d 1327, 1333. The Federal Circuit upheld claims directed to a specific improvement in the way computers operate to store and retrieve data, embodied in a self-referential table. *Id.* at 1336. Tellingly, the Federal Circuit relied on the specification's disclosure of a number of improvements over prior art databases. *Id.* at 1337.

In *Amdocs,* the Federal Circuit explained that the claims at issue, even if directed to an abstract idea, "contain[] a sufficient 'inventive concept'" to render them patent-eligible. *Amdocs*, 841 F.3d at 1300. Although the claims may recite generic components, those components work "in an unconventional distributed fashion to solve a particular technological problem." *Id.* at 1301.

Likewise, in *BASCOM*, the Federal Circuit found that the claims directed to "filtering Internet content" patent-eligible under *Alice*. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016). The court, under step two of the Alice test, found that the claims contained an "inventive concept" in the "ordered combination of claim limitations." *Id.* at 1352. The court noted that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* at 1350.

As noted above, the intrinsic record and other evidence confirms that the Express Mobile patents significantly improve the operation of the computer. The inventions permit more efficient storage of data, faster access and download speeds, faster rendering speeds, and more flexible display of information across various operating systems, browsers, screen sizes and device. Each of these improvements supports patentability.

### 1.        The Cases on which Defendant Relies Are Distinguishable

Defendant distorts the patents and their claims in an effort to make some connection between the verbiage of its cited Section 101 cases and the language of the patents.  The cases cited by Defendant, however, are readily distinguishable.  Contrary to Defendant's arguments, the case law clearly points to eligibility for patents such as the '397 and '168 patents.

Defendant first cites to *SAP Am., Inc.*, *v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018) for the proposition that one must look at the focus of the claims at the first stage of the *Alice* inquiry, but makes no attempt to draw a parallel between the purported representative claim of the Express Mobile patents and the asserted claims in *SAP Am., Inc.*  That is because there is no comparison.  Defendant's purported "focus of the claims" runs afoul of the Supreme Court's admonition to "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice*, 134 S. Ct. at 2354.  Instead, Defendant's "abstract idea" ignores the subject matter to which the claims are "directed".  *See Rapid Litig. Mgt. Ltd.,* 827 F. 3d at 1050.

Defendant next cites to *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) and asserts that "nothing in the claim discusses how" a display is generated, or "how to generate that display substantially contemporaneously with the user's selection." (D.I. 14 at 7.)  Defendant's assertion is factually incorrect.  The Express Mobile patent claims recite specifically *how* the improved computer operation takes place, by reciting (in claim 1 of the '397 patent for example) that web pages are created by way of user settings, stored in a database via information representing those settings, and later rendered by a run time engine and virtual machine using those settings.  Support for this is found in the voluminous specification and Figures explaining how to make and use this groundbreaking new invention.

Defendant next cites to *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018) and *Affinity Labs of Texas, LLC v. Amazon.com, Inc.,* 838 F.3d 1266, 1269 (Fed. Cir.

2016), asserting that the purported representative claim "is written in purely functional language and merely claims the result of building a web page based on user input." (D.I. 14 at 7.) But Defendant again ignores the actual claim language, which recites numerous elements showing how the recited elements cooperate to achieve the improved computer performance:

> 1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:
>
> (a) presenting a viewable menu having a user selectable panel of settings ***describing elements on a website***, said panel of setting being presented through a browser on a computer ***adapted to accept one or more of said selectable settings in said panel as inputs*** therefrom, and where at least one of said ***user selectable settings*** in said panel ***corresponds to commands to said virtual machine***;
>
> (b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;
>
> (c) storing information representative of said one or more user selected settings in a database;
>
> (d) generating a website at least in part by ***retrieving said information representative of said one or more user selected settings*** stored in said database; and
>
> (e) building one or more web pages to ***generate said website from at least a portion of said database and at least one run time file***, where said at least one ***run time file utilizes information stored in said database to generate virtual machine commands*** for the display of at least a portion of said one or more web pages.

(Ex. 1 at 65:44 – 66:2.)

Defendant's assertion also ignores the fact that, prior to the Express Mobile patents, web pages were rendered in a fundamentally different manner. (Hernandez Decl. at ¶ 19.)

Finally, Defendant cites to *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015). But the claims of the patent at issue in *Intellectual Ventures* are unlike the claims in the '397 and '168 patents. There was no dispute in *Intellectual Ventures* that the limitations of the claim were met by merely "tailoring content," akin to "providing different

newspaper inserts based upon the location of the individual," and "tailor[ing] advertisements based on the time of day during which [television commercials were] viewed." *Id.* at 1369-70.

In contrast, evidence here confirms that the claims of the '397 and '168 patents represent (at the time of their invention) a completely new paradigm for creating, storing, and building web pages. Unlike the '397 and '168 patents, the claimed invention in *Intellectual Ventures* provided no specific improvement to the way technology operated or a specific benefit from that technology. This is not a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation. "Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts." *Enfish*, 822 F.3d at 1336.

Because the claimed inventions teach improved techniques for creating, storing and building web pages through technological improvements, the Court need not reach step two of the *Alice* analysis and Defendant's motion should be denied.

### D.    The Express Mobile Patent Claims Amount to Significantly More than the Proposed "Abstract Idea"

Each of the Express Mobile patent claims recites individual features that are unconventional. Taken together, the "ordered combination" goes far beyond Defendant's simplistic abstract idea. Moreover, evidence establishes that the recited inventions significantly improve the operation of the computer. For each of these reasons, the claims encompass inventive elements that satisfy the second prong of the *Alice* test.

### 1.    The Claims Include Additional Unconventional Features Never Addressed by Defendant's Motion

The "abstraction" proposed by the Motion further ignores additional elements of the independent claims of the '397 and '168 patents that further narrow the claims, and thus further demonstrate their patentability.

13

For example, claim 1 of the '397 patent recites, in addition to the features above, a "viewable menu" of user selectable settings, each of which corresponds to commands to a "virtual machine." (Ex. 1 at 65:47-54.) The "virtual machine" element represents the type of special purpose computer that *Alice* itself identifies as supportive of patentable subject matter. Virtual machines, at the time of the invention, were special purpose computer environments within JAVA programming language. (Hernandez Decl. at ¶ 43.) Mr. Rempell expanded and accentuated that virtual machine in developing his inventions here. (Rempell Decl. at ¶ 11.) In this case, the special purpose "virtual machine" represents just one element of the overall invention, but itself supports patentability.

Claim 1 further recites, during the web site creation stage, generating a display "substantially contemporaneously" with user selected settings. (Ex. 1 at 65:55-57.) This element ensures that a user, when creating a web site, can immediately see changes and edits as they would appear later when the page was rendered. This feature is made possible by the various elements in combination, including the use of user settings updated in the database that can be used by the build engine to display the web page. (Hernandez Decl. at ¶ 48.) Lastly, the "virtual machine" is recited again in the web rendering stage, as a mechanism for converting the user selections into the actual viewable page. (Ex. 1 at 65:64-66:2.)

Likewise, claim 1 of the '168 patent recites specific objects or styles that include "transformations and time lines" that define how objects on the web page can change. (Ex. 2 at 64:56-60.) One common example is hover effects, where a change to an object is triggered when a mouse hovers over it. (Hernandez Decl. at ¶ 49.) These types of effects were not even possible using HTML code and browsers available at the time except through the use of more cumbersome techniques. (*Id*. at ¶ 49.) The invention of the Express Mobile patents allowed such effects to be built directly into the web page design. (*Id*. at ¶ 49.) Information

14

representative of those effects could thus be stored efficiently with the other information representative of the web page, and likewise could be used quickly to render the web page on a browser.  (*Id*. at ¶ 49.)

Claim 1 of the '168 patent also requires that the web page is "defined entirely" by the collection of objects and styles which distinguishes the claim from web publishing systems that output and store only code files.  (Ex. 2 at 64:60-62; Hernandez Decl. at ¶ 50.)  The claim further recites storing information in a database with a "multidimensional array," (Ex. 2 at 64:63), a type of database that itself was unconventional around the time of the invention (Hernandez Decl. at ¶ 50.)

Unlike claims held unpatentable since *Alice*, the claims here recite multiple elements that were unconventional at the time of the invention. (*Id*. at ¶ 29.)  Together, each collection of elements defines a claim far beyond the simplistic abstract idea asserted by Defendant.

### 2.      The Claims Each Recite Individual Elements and an Ordered Combination that Go Beyond Defendant's Proposed Abstract Idea

Each of the Express Mobile claims amounts to significantly more than Defendant's proposed abstract idea because they recite multiple elements that individually are unconventional.  Many of these elements are set forth above in Section IV.D.1.  Taken as an "ordered combination," the claims are even more unconventional.  The patents themselves and expert testimony confirm that, in contrast to conventional methods, the Express Mobile patents create a completely new paradigm for creating, storing and building web pages.  (*See* Ex. 1 at 1:10-3:6; Hernandez Decl. at ¶ 29.)

As just one example, claim 1 of the '397 patent recites a "run time file" (an executable program) and a "virtual machine" that builds web pages on the fly using information related to user settings.  (Ex. 1 at 65:63-66.)  This element alone represents a major departure from

15

conventional methods of rendering web pages. (Hernandez Decl. at ¶¶ 40, 42-43.) The virtual machine is a special purpose computer environment. (*Id*. at ¶ 43.) In Java, virtual machines are special purpose extensions of the general purpose Java language. (*Id*. at ¶ 43.) In this case, Mr. Rempell built a novel virtual machine for his invention that further enhanced the Java virtual machine. (Rempell Decl. at ¶ 11.) Thus by itself this element satisfies criteria courts have applied in finding claims patent eligible.

Indeed, *Alice* itself notes that a non-generic, *i.e.* special purpose, computer and/or the use of unconventional elements are hallmarks of patent eligible inventions that do not fall within the "abstract idea" exception. Specifically, the Supreme Court noted that the process claimed in *Diamond v. Dierh*, which involved the unconventional use of temperature measurements from a thermocouple fed into a computer, supported patent eligibility for a process for curing rubber. *Alice*, 134 S. Ct. at 2358 (citing *Dierh*, 450 U.S. 175 (1981)).

The Federal Circuit has likewise upheld patentability of claims for the same reasons. In analyzing the claims in *Amdocs*, the Federal Circuit stated that while the components "may be generic at first blush," the intrinsic record established that the claims "describe a specific, unconventional technological solution, narrowly drawn to withstand preemption concerns, to a technological problem." *Amdocs*, 841 F.3d at 1306.

Other cases similarly hold that unconventional features support patentability. *See BASCOM*, 827 F.3d at 1350 (the inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art; inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional, pieces); *McRO*, 837 F.3d at 1303 (using unconventional rules that relate sub-sequences of phonemes, timings, and morph weight sets, is not directed to an abstract idea and is therefore patent-eligible subject matter); *Enfish*, 822 F.3d at 1330 (finding as patent-eligible an unconventional logical model which

16

included all data entities embodied in a single self-referential table where convention was to use multiple, relational models); *DDR Holdings, LLC v. Hotels.com, L.P.,* 773 F.3d 1245, 1259 (Fed Cir.) (holding that the claims specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink).

As with each of these cases, the claims of the Express Mobile patents recite numerous unconventional elements.  (Hernandez Decl. at ¶¶ 35-50.).  These elements are combined into an even more unconventional and inventive whole.  (*Id*. at ¶ 29.)  They thus fall outside the "abstract idea" exception to Section 101, and instead recite patentable subject matter. Patentability is further bolstered when evaluating the dependent claims, many of which recite additional unconventional elements and thus further support patentability.  (Hernandez Decl. at ¶ 29.)  Defendant's simplistic treatment of the dependent claims should likewise be rejected.

### E.    At a Minimum, Factual Issues Preclude Summary Disposition

At this stage, patent eligibility can be determined "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Plausible factual allegations prohibit dismissal at the pleadings stage.  *Aatrix*, 882 F.3d at 1125; *BASCOM*, 827 F.3d 1341, 1352.

Here, the Amended Complaint includes a number factual allegations that, when taken as true, preclude a finding of patent ineligibility as a matter of law for each asserted patent.  As one example, the Amended Complaint alleges that each claims of the Express Mobile patents recites one or more inventive concepts that are rooted in computerized technology, and overcome problems specifically arising in that realm.  (D.I. 14 at ¶¶ 12, 60.)  The Amended Complaint contains additional detailed paragraphs describing how the inventions are not merely the routine

17

or conventional use of computers.  (DI. 14 at ¶¶ 13, 61).  Accordingly, on the pleadings alone, Defendant's Motion should fail.  See *Aatrix*, 882 F.3d at 1128 (holding that there was no proper basis for rejecting concrete allegations regarding the claimed combination's improvement to the functioning of the computer).

Expert testimony here also precludes summary judgment.  As set forth above, each asserted claim recites an ordered combination of elements that was entirely unconventional at the time of the invention.  (Hernandez Decl. at ¶¶ 29-51.)  This evidence of unconventionality also precludes summary judgment.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018).

Specifically, in *Berkheimer*, the Federal Circuit determined that a patent related to digitally processing and archiving files in a digital asset management system was not *per se* ineligible subject matter because there was a genuine factual dispute about whether the claimed invention archived documents in a way that was not previously known and that improved computer functionality.  *Berkheimer*, 881 F.3d at 1370.  The Federal Circuit held "whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination.  Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.  The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369.

At a bare minimum, there is factual dispute here about whether the asserted claims of each asserted patent recite computerized systems that were unconventional at the time and which improved computer functionality.  Accordingly, under *Berkheimer* and *Aatrix*, it would be inappropriate to find any asserted claim unpatentable.

###### F.      Willful Infringement

Based on information currently available, Plaintiff does not object to limiting its claims of willful infringement of the '397 and '168 patents to the date DreamHost received notice of those patents in the Original Complaint.  In the same manner, Plaintiff is amenable to limiting its claims of willful infringement of the '287 and '044 patent to the date DreamHost received notice of those patents in the Amended Complaint.

###### G.      Compliance With the Marking Statute Is a Question of Fact Not Suitable for Adjudication on a Motion to Dismiss

Citing *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 f.3d 1350, 1366 (Fed. Cir. 2017), Defendant asserts that Express Mobile must plead and prove compliance with 35 U.S.C. § 287(a).  But compliance with § 287 is a question of fact.  *Id.* at 1366.  The Federal Circuit has held that a defendant must identify "specific unmarked products which the alleged infringer believes" should have been marked:

> We hold an alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked "patented articles" subject to § 287.  To be clear, this is a low bar.  The alleged infringer need only put the patentee on notice that he or his authorized licensees sold ***specific unmarked products which the alleged infringer believes practice the patent***.
>
> ***
>
> Permitting infringers to allege failure to mark without identifying any products could lead to a large scale fishing expedition and gamesmanship.

*Id.* at 1368.  In direct contravention to the holding in *Arctic Cat*, Defendant asserts "Express Mobile has failed to allege here that any of its presumptive licensees have marked their products with the asserted patents."  (D.I. 14 at 18.)  Whether Express Mobile's licensees are obligated to mark is an open question of fact.  There has been no adjudication that any of the licensees practice the asserted patents; indeed, the licensees denied liability for infringement of the

asserted patents. Defendant's assertion is insufficient and is a question of fact; it is an inappropriate basis for a motion to dismiss.

Defendant also asserts that Express Mobile failed plead compliance and, in support, cites to a statement by Express Mobile that it is "a practicing entity that offering solutions related to website and web app development." (D.I. 14 at 17.)

However, Defendant concedes that whether or not Express Mobile actually sells products covered by the asserted patents is a matter "peculiarly within Express Mobile's own knowledge." (D.I. 14 at 17.)  Express Mobile does not practice its patents.  Consistent with the position it has taken in its responses to motions to dismiss currently pending in the Northern District of California,[2] of which Defendant's § 101 arguments are largely duplicative, Express Mobile has alleged that due to an automobile accident sustained by its CEO, Express Mobile has had *limited business operations*, but, has *continued to explore opportunities* to develop innovative technology solutions internally, with its directors, and with its licensees, to address current and future market needs.  Express Mobile does not currently sell products that practice its patents. (Rempell Decl. at ¶ 5.)

Because Defendant has not identified specific unmarked products which Defendant believes should have been marked and because Express Mobile does not practice its own patents Defendant's motion to dismiss should be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

---

[2] *See Express Mobile, Inc. v. Pantheon Systems Inc.*, C.A. No. 3:18-cv-04688; *Express Mobile, Inc. v. Code and Theory LLC*, C.A. No. 3:18-cv-4679

DATED:        January 25, 2019            DEVLIN LAW FIRM LLC

                                          /s/ Timothy Devlin
                                          Timothy Devlin (DE 4241)
                                          1306 N. Broom Street, 1st Floor
                                          Wilmington, DE  19806
                                          (302)-449-9010
                                          tdevlin@devlinlawfirm.com
                                          Counsel for Plaintiff Express Mobile, Inc.


**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that all counsel of record who are deemed to

have consented to electronic service are being served with a copy of this document via electronic

filing on January 25, 2019.

                                          /s/ Timothy Devlin
                                          Timothy Devlin