IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EXPRESS MOBILE, INC.<br><br>    Plaintiff,<br><br>v.<br><br>DREAMHOST, LLC<br><br>    Defendant. | C.A. No. 18-1173-RGA<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF DR. EDWIN HERNANDEZ IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS**

I, Edwin Hernandez declare as follows:

**I.   INTRODUCTION**

1.   I have been retained by Express Mobile, Inc. ("Express Mobile") as an expert witness in this litigation against DreamHost, LLC ("DreamHost") as well as other defendants against whom Express Mobile has brought claims.

2.   My educational background, career history, publications, and other relevant qualifications can be found in my Curriculum Vitae, attached as Exhibit 1 to my Declaration.

**II.   QUALIFICATIONS AND EXPERIENCE**

1.   A detailed record of my professional qualifications, including the patents on which I am a named inventor and the academic and professional publications on which I am an author, is set forth in my curriculum vitae attached to this report as Exhibit 1.

2.   I have more than 20 years of experience working on Internet and Web-based Technologies, including Virtual Machines, such as Java-Micro Editions, Android, and others. I received a Ph. D. in Computer Engineering from the University of Florida in 2002 and a Master's of Science in Electrical and Computer Engineering from the University of Florida in

1

2000.  I also obtained a Bachelor's of Electronics Engineering from the Costa Rica Institute of Technology in 1995.

3. I currently work for EGLA CORP a company dedicated to innovation, patents, and software development.  As part of my duties, I run a technology incubator called EGLAVATOR.  The EGLAVATOR receives startups and technologies in the fields of cloud computing, healthcare, media, and others.  All EGLAVATOR companies use a web-based component for their designs, products, and most are web-based businesses.

4. I am familiar with the subject matter as I have been involved with the Internet since at least 1993-1994.  In 1995, I started a company called COMPUNET in Honduras that, in 1997, became one of the first Internet Service Providers (ISP) in that country.  As one of the core businesses of any ISP, COMPUNET was involved in web creation, domain hosting, emails, dial-up services, as well as other internet-related duties.  As part of my daily tasks, I became familiar with HTML and Javascript, at very early stages, even versions of Wireless Markup Language ("WML") the language that was used for many mobile phones.  Additionally, I have worked for over two decades on hosting my own domains, developing HTML, CSS, Javascript and dealing with the nuances of browsers, from mobile, to different rendering engines, and in general with all aspects of web design and internet applications.

5. I have, in the last 20 years, used and gained experience with many versions of HTML, CSS, Javascript, VRML, WML, and many other web-related technologies.  I have participated in numerous web-based systems from mobile to server.  I worked 7 years at Motorola in mobile development, working with the Java Virtual Machine (JVM) as a technical leader, and later on as Webkit browser expert for Android phones.  I also worked directly with developers and engineers for the "Opera" browser that was in use in many Java Micro-Edition phones.

6.     I am an accomplished researcher and innovator with 11 issued patents and trade-secreted technologies related to Web, Wireless communications, Bluetooth, Cloud-Computing, and others.

7.     As part of my work at Motorola, Inc, I was involved with the development, certification, and deployment of many components that were part of the "Java Virtual Machine" including functions and APIs for Bluetooth, Security and Trust, Browsers, Multimedia Messaging, Location Services, and others applications.  I am also the author of several publications including a 2009 article entitled "War of Mobile Browsers."

8.     Since 1996, I have designed, and created websites using many technological and advanced tools or simply editing in a text-based interface.  Hence, I have personally the myriad of issues and difficulties that HTML brings for proper display of information.  These issues and difficulties, have been faced by software engineers and designers since HTML became a standard in late 90s.

9.     Recently, I was granted U.S. Patent No. 10,123,074 entitled "Method, System, and Apparatus for Multimedia Content Delivery to Cable TV and Satellite Operators" for an invention marketed as Cloud to Cable TV.  This invention renders HTML-pages using headless browsers as part of creating streaming music and TV channels.  The difficulties found using Javascript, embedded plugins, Synchronous and Asynchronous Javascript calls, and many others, have only increased in complexity.   Modern HTML-based application are now replacing old-fashion standalone applications.

10.    Recently, I was granted U.S. Patent No. 10,123,074 entitled "Method, System, and Apparatus for Multimedia Content Delivery to Cable TV and Satellite Operators" for an invention marketed as Cloud to Cable TV.  This invention renders HTML-pages using headless browsers as part of creating streaming music and TV channels.  The difficulties found using

Javascript, embedded plugins, Synchronous and Asynchronous Javascript calls, and many others, have only increased in complexity. Modern HTML-based application are now replacing old-fashion standalone applications.

11. In 2008-2009, I developed my own rendering engine for a Java-Micro Edition (J2ME) devices and an XML-based markup language designed to simplify mobile development and deploy features quickly. This rendering engine was deployed by a company called SENSEI, Inc in their applications.

12. Since 2007, I have gained experience in compiling and modifying WebKit, primarily for Android development, and have observed first-hand how HTML is rendered by a browser. I gained an understanding of how caching and other techniques require substantial testing and that many aspects of development and HTML are not as simple as they appear in a final web application. Internally, in the browser, an HTML page can be seen as a "graph" with multiple nodes that are interpreted as content.

13. From 2012 thru 2014, I conducted research and investigated how to use HTML, Virtual Machines, and Cloud with Cable Operators. This work is now in use in several cable operators and is commercialized under "Cloud to Cable TV." The main difficulty of this work is to use headless browsers with a rendering engine that is capable of understanding Javascript, HTML, CSS, and even Flash or other embedded technologies in such a way that rendering of images can be performed in mobile, web, and Cable TV systems. The patent covering this invention is US Patent No. 10,123,074 and subsequent continuations. Once again, challenges arose when designing and building web pages that worked correctly for the purposes of creating Music and TV channels.

14. Now, much of the current work I do through my technology incubator, the EGLAVATOR is to help software companies—from small startups to others—create new

technologies and applications, protect their intellectual property, and prototype those ideas. As such, I continue to research and monitor academic and industry technology development to keep as up to date as possible regarding advances in information systems. This includes selection as a Judge for the "Mobile World Congress" in February 2019.

15. In sum, I have extensive experience both as a developer and a researcher relating to Internet and Web-based systems. I have developed tools to collect data from Web browsers and Web servers, organize and store Web data, and implement Web analytics and systems that can leverage this Web user data to make using and searching the Web smarter and easier.

### III. PREVIOUS TESTIFYING EXPERIENCE

16. A list of all other cases in which, during the previous 5 years, I have testified as an expert at trial or by deposition can be found in my CV. Exhibit 1.

### IV. COMPENSATION

17. I am being compensated for my services at a rate of $525 per hour. I am being separately reimbursed for any out-of-pocket expenses. My compensation does not depend in any way on the outcome of this litigation or the testimony or opinions that I express.

### V. MATERIALS CONSIDERED

18. My opinions are based on my experience in this field, and are necessarily formed by my own experiences, materials I have read over the years, and discussions I have had with colleagues during my career. In addition, I have reviewed and considered the following materials in forming my opinion:

    a. the '397 and '168 patents;

    b. the prosecution history of the '397 and '168 patents; and

    c. Defendant's Motion to Dismiss

I.      **The Background of the Express Mobile Inventions**

19.     Prior to the invention of the Express Mobile patents, web pages were created, stored and rendered in a fundamentally different manner.  Specifically, individual web pages were typically created by either programming directly in HTML or JavaScript code, or by using a visual editor that output HTML formatted files.  The result of either creation technique was a collection of pages of source code including HTML, which could be supplemented by adding JavaScript or Java, which defined the visual layout, style and supplemented Web page interactivity in a manner that was compatible with the Internet standards at the time.

20.     These static code files defined all the fixed parameters of the web page, for example the formatting and location of text; or the location, size and aspect of pictures.  While Web content authoring matched this static code creation process, there were limited examples of interactive, more user-friendly authoring features where graphics (for example, photographs) could be added or dropped into certain placeholders on a Web page mockup, but the overall format and structure of the web page was fixed, as defined by the source HTML file and any supplemental logic code.

21.     HTML uses a "Document Object Model" approach, where tags of text are used to identify segments of a web-page such as "title," "metadata," and hundreds of tags.

22.     In the 90s, "Applets" were used to include functionality that was not easy or not possible to create with the limited HTML tags that existed at the time.  Today, "Applets" have been replaced by JavaScript objects, CSS, and many new "tags" that have been incorporated into HTML 5.

23.     At the time, other companies were also exploring the use of more interactive, unconventional components to circumvent the limitations of conventional web publishing models.  One of the Java patents assigned to Sun Microsystems, U.S. Patent No. 5,842,020 to

Faustini, represented one such attempt. This was a primary reference asserted against the Express Mobile claims during prosecution. (See, e.g., '397 patent file history [pp. 200-213], 2001-08-13 Office Action.) However, while Faustini made use of run time files and Java virtual machines, it lacked the inventive collection of features of the Express Mobile patents, such using a browser-based interface to build a web page, defining the web page as a collection of user settings, storing information related to those settings in a database, and then later using that information to render a web page via a run time file and virtual machine.

24. Other visual web editors likewise included some features of the Express Mobile invention, but no prior art system or concept included the pioneering combination of ideas described and claimed in the Express Mobile patents.

25. Earlier Web development methodologies suffered from a number of flaws. First, creation of the web page could be cumbersome, in particular when web pages could not be viewed during the creation process as they would later appear in various browsers or devices. This was a particular problem for editors that did not run inside a browser. Moreover, each individual web page of a website needed to be stored in its HTML or pseudo-code form. Storage of individual pages in this manner was inefficient, and required excessive space and could result in longer access times. Commonly, the size and formatting of the stored files led to slow downloading of the web page file to a user's computer, and slower rendering by the browser, increasing the dreaded wait time for a page to load.

26. Lastly, when rendered on different operating systems or browsers, web pages would often display incorrectly, show runtime errors, become less easy to use or wholly unusable for reading or interaction and not scale or size to the specific browser version. One partial solution to this issue would be to design multiple alternative web pages for the most common "combinations" of operating systems, browsers, display sizes and resolutions, etc. But this

"solution" severely impacted the productivity for web designers when creating and later updating web pages, both to keep pace with the growing combinations and to limit functionality to the lowest common denominator set of the combinations.

27.  Many of these issues are documented in the Background section of the Express Mobile patents. The patents note that the traditional languages such as HTML and JavaScript were generally limited, inflexible and slow:

> Conventional mark-up and scripting languages have not been designed for serious multimedia applications. They have almost no file handling ability and very little computational power. In addition, they are remarkably slow and inefficient.

('397 patent at 1:17-21.)

28.  The result, as the patents note, is inflexible rendering of the web page on a screen, with attendant formatting errors and wasted screen space:

> For example, HTML and JavaScript are incapable of reformatting text and scaling buttons or images dynamically. In addition, most conventional web publishing applications design a web page layout to fit into a 640 pixel wide screen. This means that the ability for higher resolution screens to display more data horizontally is lost. Since capability is wasted on the horizontal plane, unnecessary vertical scrolling may be required. Further, on higher output resolution devices (screens), unsightly extra white space or background may be prevalent.

(*Id*. at 1:40-49.)

**II.    The Express Mobile Patent Inventions**

29.  In contrast to conventional prior art methods, the Express Mobile patents bring together a number of disparate ideas and concepts, to create a pioneering new paradigm for creating, storing and building web pages. Each claim recites an ordered combination of features and concepts that was unconventional at the time. These features and concepts are set forth in roughly 64 columns of Specification text (excluding the Background section and patent claims),

along with more than sixty Figures.  (*See id.*)  This extensive specification is necessary to lay out in detail all the features and concepts in this pioneering way of making and using web pages.

30.     As set forth in the Summary of the patents, this inventive methodology generally involves building a web page by defining it as a set of user-selected "objects" and/or "settings." This may include building the page using a "What You See Is What You Get" or "WYSIWYG" environment that was itself browser-based, so that no native software is needed and so that the page can be viewed as it is created or edited:

> Aspects of the invention can include one or more of the following features.  A browser based build engine is provided that includes a browser based interface. The entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page.

(*Id*. at 2:32-37.)

31.     "Working directly" with the actual Web page while creating within a Web browser is a fundamental improvement in the Web content creation process and a true embodiment of the goal of a WYSIWYG interface, as defined by the Microsoft Press Computer Dictionary (4th ed. 1999):

> WYSIWYG \wiz'e-wig'\ adj. Acronym for What You See Is What You Get. Allowing a user to view a document as it will appear in the final product, and to directly edit the text, graphics, or other elements within that view. A WYSIWYG language is often easier to use than a markup language, which provides no immediate visual feedback regarding the changes being made." p487

32.     The creator can actually work within the intended browser interface, to faithfully see what an intended user would get.

33.     Unlike conventional models, the result is not a markup language code file for the web page, but instead a collection of user selected objects and object attributes.  These can be saved in a database, for ease of access and efficient storage:

> In one aspect, the invention includes a multi-dimensional array structured database, that, in addition to storing the numeric and string data found in

9

> conventional databases, also stores multi-dimensional arrays of various multimedia objects. They include colors, fonts, images, audio clips, video clips, text areas, URLs and thread objects

(*Id*. at 2:5-9.)

34. Since complete code files for each page do not need to be stored, the page structure—the full HTML code itself—is created on the fly each time the page is loaded in a user's Web browser. This is achieved in part through a browser-appropriate "run time engine" and related files:

> A run time generation procedure creates a compressed program customized run time engine file, with an associated database and a build engine generated HTML Shell File.

(*Id*. at 2:39-41.)

35. The run time engine is an executable computer program that uses the information from the database to build HTML files for each web page when the web page is rendered on a browser.

36. This allows the system to optimize the page based on the operating system, browser, screen size, etc.

37. This aspect of the invention is one of the features that make it unconventional, because it can place the webpage in the right format to be rendered correctly. For example, a web editor may enable the use of an "iFrame tag", or a "div" tag, which a stylesheet is applied to: **<div id="patent_info">** and then this div is of **"float: right"**. In this example, and depending on the DOM created by a particular website, WebKit may render it correctly, but Gecko (another rendering engine) might not. Using the unconventional inventions of the Express Mobile patents, this situation can be resolved in a clean fashion.

38. Defendant's argument that the '397 and '168 patents claim ineligible subject matter appears to assume that:

> a) An HTML DOM with information representing settings regarding Animations, Responses, Buttons, Applets, stored in a database is not a transformative step,

10

      b) rendering a web page across disparate HTML rendering engines and display sizes is trivial,

      c) Use of virtual machines as trivial task, without understanding that the Java to Javascript two-way communication as found in an exemplary embodiment of the Express Mobile inventions was nonexistent at the time.

Contrary to this apparent viewpoint, the manner in which the inventions of the Express Mobile patents manage the numerous permutations and combinations of "rendering engines," "mobile," "web," and versions of HTML with different DOMs, was highly unconventional at the time.

    39.    The run time engine allows the system to optimize the page based on the operating system, browser, screen size, etc. This was achieved in an unconventional manner by, for example, the method depicted in FIGS 26 and 27. Defendant's argument that creating the database (DTA) is a non-transformative step oversimplifies the process required and described by the exemplary embodiments of the Express Mobile patents. In reality, this is a complex process, as set forth within the patents themselves:

> "Each object can have multiple object states, responsive to various user interactions, which can result in numerous types of visual and audio responses and actions."

(*Id*. at 8:7-9)

    40.    Other unconventional elements in various embodiments of the inventions of the Express Mobile patents include the runtime and database communications between CAB runtime and/or JAR runtime with the JavaScript code executed within the browser. These embodiments of the inventions of the Express Mobile patents include a wrapper functionality made to communicate between Java and JavaScript effectively enabling communications from the JAR/Applet with the JavaScript running in the browser. As mentioned before, this aspect of the inventions of the Express Mobile patents was nonexistent until the 2010's era when the use of a virtual machine and run-time could be authenticated with a digital signature.

41. To offer an analogy, prior art methods of web development were akin to building a picture frame, storing the frame, and then sending it to a user when requested. While a user could insert printed photographs into the existing frame, the frame itself (the HTML file) is already constructed, and accepts a picture of a specific size. The invention of the Express Mobile patents is fundamentally different. It stores a blueprint for the picture frame, and sends that blueprint when requested. Each frame is then built on the fly. Depending on the user's screen size and resolution, the entire "picture frame" might be constructed with different dimensions, fonts, etc.

42. Using what was typically available at that time such as .CAB and .JAR files (Fig 4b, 33b), the Express Mobile patents use virtual machines in a way which, at the time, was unconventional.

> The CAB and JAR files both include the runtime engine and database in compressed executable form. The CAB file(s) will be activated by the HTML shell file if it senses the browser as being 30 Microsoft Explorer, otherwise it will activate the JAR file(s). The processes for creating the HTML shell file and the CAB and JAR files are described in greater detail below in association with FIG. 26 and FIG. 27, respectively.

(*Id*. 8:26-33)

Another unconventional aspect of the Express Mobile patents was the ability to link Java and JavaScript at the web page creation stage.

> The present invention provides a real time, dynamic linkage between JAVA and HTML including two-way communications, in real time, between JAVA and JavaScript.

(*Id.* 3:4-6)

43. In my opinion, Defendant also ignores the unconventional way in which virtual machines and runtime engines were used. Virtual machines, at the time of the invention, were special purpose computer environments that created a generalized processing environment

regardless of the combination of software and hardware that is being used on the physical device on which it is run. The Java VM™ and Java programming language ™ could be extended to support these environments. Java is a general-purpose computer programming language that allows extensions to be added and the ability to utilize a specialized class loader. In the context of the Express Mobile patents, this would enable the meta code of the invention to be processed correctly. A "virtual machine" was one of the special purpose computer environments that could extend the normal Java code. I understand that Mr. Rempell, the inventor on the Express Mobile patents, extended and enhanced the Java virtual machine in developing his invention. (*See, e.g.,* Ex. 1 to the co-filed declaration of Timothy Devlin at 39:57-65; 41:30-45; 43:33-41; 44:12-13; 45:64-65; 46:30-42; 47:26-30; 47:62-48:4.)

44. This approach to web publishing was radically different from conventional methods and only made possible by bringing together multiple different concepts, ideas and features as claimed in the Express Mobile patents.

45. The inventions of the Express Mobile patents were ahead of their time, but eventually the industry caught up. The original priority application for the Express Mobile patents was filed in 1999. More than a decade later, his patented ideas were widely adopted through the implementation of "HTML 5," which has become the industry standard for web development and browser functionality around 2010-2012. In particular, browser functionality was updated around that time to include features previously unavailable within the browsers themselves, allowing widespread application of Mr. Rempell's invention.

46. Each claim of the Express Mobile patents reflects this pioneering new methodology. Claim 1 of the '397 patent, for example, recites (among other features):

- displaying a panel of settings within a browser, which a user can select to create the page (*id.* at 65:47-48);

- storing information representative of those settings in a database (*id*. at 65:58-59); and

- building web pages using a run time file from information stored in the database (*id*. at 65:64-66).

47. Likewise, claim 1 of the '168 patent recites (among other features):

- receiving user input regarding web page objects and styles ('168 patent at 64:50-62);

- producing a database that holds the data defining those objects and styles (*id*. at 64:63-67); and

- producing the database so that a web browser with a run time engine can generate the web site from the object and style data (*id*. at 65:1-6).

48. Claim 1 of the '397 patent further recites, in addition to the features above, a "viewable menu" of user-selectable settings within a browser, each of which corresponds to commands to a "virtual machine." ('391 patent at 65:47-54.) Moreover, during the web site creation stage, the system displays changes and edits "substantially contemporaneously" with user selected settings. (*Id*. at 65:55-57.) This element ensures that a user, when creating a web site, can immediately see changes and edits as they would appear later when the page was rendered. Lastly, the "virtual machine" is recited again in the web rendering stage, as a mechanism for converting the user selections into the actual viewable page. (*Id*. at 65:64-66:2.)

49. Likewise, claim 1 of the '168 patent recites specific objects or styles that include "transformations and time lines" that define how objects on the web page can change. ('168 patent at 64:56-60.) One common example is hover effects, where a change to an object is triggered by hovering a mouse cursor over the object. Prior to the Express Mobile invention, the only way to achieve such effects was through more cumbersome techniques with stand-alone desktop applications and the additional burdensome methodology in using the desktop application, then loading and running the code the desktop application created into the browser

to see how it looks and works, which would then need to be performed for each browser version, operating system and display type. The invention of the Express Mobile patents allowed such effects to be built directly into the web page design. Information representative of those effects could thus be stored efficiently with the other information representative of the web page, and likewise could be used quickly to render the web page on a browser.

50. Claim 1 of the '168 patent also requires that the web page is "defined entirely" by the collection of objects and styles. (*Id*. at 64:60-62.) The claim further recites storing information in a database with a "multidimensional array." (*Id*. at 64:63.) Use of this type of database in this manner was unconventional at the time of the invention.

51. Multiple dependent claims recite further details and features. Of course, the full scope of each independent or dependent claim is set forth within the patents themselves, as impacted by the Court's claim construction.

### III. The Improvements of the Express Mobile Inventions

52. The Express Mobile patents offered substantial improvements. The Specification notes that the manner in which data is stored allows for a relatively small "run time environment," i.e., the basic HTML framework created by the system:

53. Because of the implementation of a variety of performance and file reduction techniques, the entire run time environment can range from as low as 12K, and no larger than 50K. ('397 patent at 2:60-63.)

54. This relatively small file allows for fast loading speeds, even using older 56k modems prevalent at the time:

> Although the compressed image, audio, and/or video files must also be downloaded, with a reasonable web site design, web pages should load quickly. The initial run time environment is no larger than 25K, thus the initial web page should generally load in less than 2 seconds, and subsequent web pages in less than 1 second with a 56K modem, even with numerous image files.

(*Id*. at 2:64-3:3.)

55. This could be an order of magnitude faster than with prior methods, so that a page that previously took ten seconds to load could load instead in one second or less. This structure also permits more efficient storage of the data used to later build the web pages, as well as the ability to change the web page more efficiently by editing user settings rather than editing multiple lines or multiple versions of an HTML file.

56. The Applicant specifically pointed to these advantages during prosecution:

> In contrast, the claimed invention generates web pages using two features: a run time engine and a database of user settings. As described in the specification of the claimed invention, the database contains user settings, which may be thought of as attributes of display objects. The run time engine is used to accept the attributes and generate virtual machine commands, which then generate a display. In addition to having a smaller "footprint" (code size which is transmitted for display over a communication system), changes to the code during production are more easily implemented.

('397 patent file history [pp. 229-241], 2001-12-13 Amendment After Final at 5.)

57. The Specification further notes that the invention permits scaling of web pages and elements within the web page, to most efficiently use the screen space:

> When the web site/web page is accessed on the WWW, web page scaling technology can be accessed to generate web pages that are scaled to the user's screen resolution. A technique is provided so that an applet's size (height and width) can be set in real time under the control of either the interface or the build engine.

('397 patent at 2:43-48.)

58. This same flexibility exists during the website creation process. (*Id*. at 2:1-4.) Thus whereas the prior art resulted in visually disjointed web pages based on the particular browser, window size, screen resolution, operating system or device; the Express Mobile invention here offers consistent appearance for creating, editing and viewing web pages, in the WYSIWYG sense and beyond.

I declare under penalty of perjury under the laws of the United States that to the best of my knowledge and recollection the foregoing is true and correct.

Executed this 25th day of January, 2019.

<div style="text-align: right">*/s/ Edwin Hernandez*</div>

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 25th day of January, 2019.

> */s/ Timothy Devlin*
> Timothy Devlin